J-A29041-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
RICHARD COOK :
:
Appellant : No. 616 EDA 2017

Appeal from the Judgment of Sentence January 20, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0008509-2015

BEFORE: OTT, J., DUBOW, J., and STEVENS*, P.J.E.

MEMORANDUM BY STEVENS, P.J.E.: **FILED DECEMBER 10, 2018**

Appellant, Richard Cook, appeals from the judgment of sentence entered in the Court of Common Pleas of Philadelphia County following his conviction at a bench trial on the charges of possession with the intent to deliver a controlled substance ("PWID"), possession of a controlled substance, criminal conspiracy (simple assault), possession of firearms prohibited, firearms not to be carried without a license, criminal trespass, carrying firearms in public in Philadelphia, possession of an instrument of crime, simple assault, recklessly endangering another person, and resisting arrest.[1] After a careful review, we affirm.

_____

[1] 35 P.S. §§ 780-113(a)(30) and (a)(16); 18 Pa.C.S.A. §§ 903, 6105, 6106, 3503, 6108, 907, 2701, 2705, and 5104, respectively.

_____

* Former Justice specially assigned to the Superior Court.

The relevant facts and procedural history are as follows: Appellant was arrested, and on October 14, 2016, represented by counsel, he proceeded to a bench trial. At trial, Niketta Burnside testified that, on June 23, 2015, she was living at 45th and Market Streets in Philadelphia with her children and then paramour, Dennis Scott. N.T., 10/14/16, at 11. At 4:30 a.m., she awoke to feed her infant and discovered the residence had no electrical power. *Id.* She heard someone outside yelling, "Power outage. Power outage." *Id.*

Ms. Burnside proceeded downstairs to the area where Mr. Scott was asleep and spoke to him about the lack of electricity in the residence. *Id.* Suddenly, someone knocked on the front living room window, and Mr. Scott opened the front door. *Id.* A man, who Ms. Burnside identified in court as Appellant, informed the couple that he was "letting the neighbors know that there was a power outage." *Id.* at 12.

Ms. Burnside testified she shut the front door, and the couple sat in the living room. *Id.* at 13. Ms. Burnside noticed the houses across the street appeared to have electricity, so Mr. Scott went into the backyard to investigate further. *Id.* The backyard was illuminated by a security light in the complex's courtyard. *Id.* at 13, 53, 59. As Mr. Scott stood outside the back door, Ms. Burnside observed as a man, who Ms. Burnside identified in court as Appellant's co-defendant, Jerome Livingston, entered the backyard and pointed a gun at Mr. Scott. *Id.* Mr. Livingston came within ten feet of Mr. Scott and said, "Don't move." *Id.* at 15.

Ms. Burnside ran upstairs with her infant, locked herself in a bedroom with her other child, and called 911. *Id.* at 16. The police arrived within five or ten minutes. *Id.* at 23, 56. The police presented her with Mr. Livingston, who the police had apparently captured, and she positively identified him as the person who had been in her backyard. *Id.* at 22-23.

The next day, Ms. Burnside examined her property to determine the reason her residence had no electrical power. *Id.* at 23-24, 54. She discovered that a main breaker box in the backyard had its power switched to the "off" position. *Id.* at 24. When she flipped the switch to the "on" position, electrical power was restored to her home. *Id.* She testified that the breaker box controlled the electricity solely to her residence. *Id.*

Ms. Burnside testified that, prior to the incident on June 23, 2015, she had never met Appellant or Mr. Livingston, and neither man had permission to be on her property. *Id.* at 27. She also testified that Mr. Scott showed no indication that he was acquainted with either man prior to June 23, 2015, and Mr. Scott did not invite the men over at 4:30 a.m. *Id.* at 54-55. Ms. Burnside confirmed there was "no doubt" in her mind that Appellant was the person who knocked on her front door on June 23, 2015, and announced there was a power outage in the neighborhood. *Id.* at 67.

Sergeant Arthur Anderson testified that he was the first supervising officer on the scene, and he, along with another officer, approached the backyard of the subject property, where they were met by Mr. Scott. *Id.* at

74. Sergeant Anderson testified Mr. Scott was afraid and announced that he had just been robbed at gunpoint. *Id.* at 81. Mr. Scott told the Sergeant that "the males were at the back of the residence [and] [t]hey fled out the back of the property upon police arrival." *Id.*

Sergeant Anderson testified that the police had been provided with information that they "were looking for two suspects. Suspect number one was a [] black male wearing all black clothing. Second suspect was a black male, muscular build, wearing a gray shirt with a white shirt underneath." *Id.* at 87. Sergeant Anderson set up a perimeter around the scene to look for the suspects.

Police Officer Joseph Digangi testified that he was directed by Sergeant Anderson to check the area for suspects, and he found Mr. Livingston hiding in a bush in the backyard of the subject premises. *Id.* at 114-15.

Police Officer Christopher Campbell testified that he was part of the police perimeter ordered by Sergeant Anderson. *Id.* at 120. He confirmed that Mr. Livingston was hiding under a bush behind the subject house and was arrested by Officer Digangi. *Id.* at 120-21. He also testified that, at approximately 5:35 a.m., he went to the rear of the courtyard of the houses on the 4500 block of Market Street, and he climbed onto construction scaffolding and ladders that were in the yard at 20 South 45th Street. *Id.* at 121. He observed Appellant, who was texting on a cellphone, squatting down and leaning against a fence in the backyard of 22 South 45th Street. *Id.* at

122, 133. Officer Campbell testified that Appellant's location was approximately twelve or fifteen feet from where Mr. Livingston was found hiding in a bush. *Id.*

Officer Campbell ordered Appellant to "show his hands[,]" and Appellant responded, "Fuck that. You're just going to have to shoot me." *Id.* at 122. Appellant then jumped over the fence into the rear yard of 24 South 45th Street and started to climb the fence to proceed out of that rear yard. *Id.* Apparently seeing that officers were positioned on the other side of the fence, Appellant retreated back into the rear yard of 24 South 45th Street, ripped the screen off the residence's back window, opened the window, and then climbed into the window. *Id.* at 122-23. As Appellant climbed through the window, a fellow police officer deployed his taser; however, it had no effect on Appellant who continued fleeing into the house. *Id.* at 123.

Officer Campbell heard a female voice screaming for help inside of 24 South 45th Street, and a female occupant stuck her head out the window screaming "There's somebody in my house. There's somebody in my house." *Id.* at 124. Officer Campbell told her to lock the door of the room and officers, including Officer Campbell, entered the residence from the rear and front. *Id.* at 123. Officer Campbell discovered Appellant hiding in a closet in a second floor bedroom. *Id.* Appellant was hit with the taser again; however, it appeared to have no effect on Appellant. *Id.* After a struggle, the police handcuffed Appellant. *Id.*

Following the capture of Appellant, Officer Campbell proceeded to the rear yard of 22 South 45th Street. *Id.* at 124. He seized a cellphone. *Id.* He also observed a small gap in the wooden picket fence between the houses on 20 and 22 South 45th Street, and inside the gap he "observe[d] a black handgun, and a clear plastic bagg[ie] with a large amount of off-white, chunky substance[.]" *Id.* at 124-25. He testified that it would have been easy to reach from the rear yard of 22 South 45th Street and drop the items into the gap. *Id.* at 125. The gun and baggie were right beside each other. *Id.* at 91. Officer Campbell testified that, when he initially observed Appellant squatting down in the rear yard of 22 South 45th Street, he was "less than arm's reach [and] snugged up against" the gap in the fence from which the gun and baggie were recovered. *Id.* at 142-43.

Detective Rudolph Valentine testified that he processed the scene and the baggie testified positive for crack cocaine. N.T., 10/17/16, at 33-34. He also testified the firearm seized from the fence was a loaded .40 caliber firearm. *Id.* at 34-36. Mr. Livingston had $3,000 in cash on his person at the time of his arrest. *Id.* at 37. Detective Valentine testified the crack cocaine was actually a "brick." *Id.* at 45.

The parties placed numerous stipulations on the record, including the fact Appellant was ineligible and not licensed to possess a gun on June 23, 2015; the substance in the baggie tested positive for cocaine and weighed 99.046 grams; and the seized firearm was operable. *Id.* at 69-74. Further,

the parties stipulated that, if the Commonwealth called Police Officer Craig Perry to testify, he would testify that he attempted to lift latent fingerprints from the firearm but the results were negative for fingerprints. *Id.* at 69. Officer Perry would further testify that he swabbed the firearm for DNA. *Id.* at 70.

Moreover, the parties stipulated that, if the Commonwealth called Lisette Vega, who is assigned to the Philadelphia Police Department DNA Lab, to testify, she would testify that she analyzed samples of DNA taken from Appellant and Mr. Livingston. *Id.* at 71-72. She found partial DNA in the handle, magazine release, and trigger area of the firearm; however, due to insufficient data, the samples were inconclusive as to Appellant and Mr. Livingston. *Id.* at 72. She also found DNA in the empty magazine, which is located inside the firearm, but Appellant and Mr. Livingston were excluded as contributors for the DNA. *Id.* Furthermore, the parties stipulated that, if the Commonwealth called Police Officer Melvin Floyd as an expert, he would opine that the cocaine was possessed with the intent to distribute it.[2] *Id.* at 74.

Based on the aforementioned, the trial court convicted Appellant of the offenses indicated *supra*. On January 20, 2017, Appellant proceeded to a sentencing hearing, at the conclusion of which the trial court imposed an

---

[2] As the trial court noted in its opinion, Mr. Scott did not testify at trial. Trial Court Opinion, filed 10/11/17, at 2 n.1. Following the incident at issue, Ms. Burnside and Mr. Scott "broke up," and the police were unable to maintain contact with him. *Id.*

aggregate of six years to twelve years in prison. Appellant filed a timely motion for reconsideration of his sentence, which the trial court denied. This timely, counseled appeal followed. On February 13, 2017, the trial court directed Appellant to file a Pa.R.A.P. 1925(b) statement, Appellant complied, and the trial court filed a responsive Pa.R.A.P. 1925(a) opinion.

On appeal, Appellant sets forth the following issues in his Statement of Questions Presented (verbatim):

1. Did not the lower court err in finding Appellant guilty of conspiracy on insufficient evidence where he was proved only to be merely present at the scene of a crime ten minutes before it was committed?

2. Did not the lower court err in finding Appellant guilty of possession of a controlled substance with intent to deliver and possession of a firearm on insufficient evidence of possessing either the drugs or the gun where he was never seen in possession of either item, was never seen occupying or reaching into the backyard where they were found, and was excluded as a source of the DNA found on the gun?

Appellant's Brief at 3.

In his first issue, Appellant contends the evidence was insufficient to sustain his conviction for conspiracy. Specifically, he avers the evidence was insufficient to demonstrate that he had the intent of promoting or facilitating a crime or that he agreed to commit a crime. In this vein, he avers he was "merely present ten minutes before the commission of Mr. Livingston's crimes[.]" *Id.* at 11. Appellant further contends:

The only association between Appellant and Mr. Livingston in this trial record is that [Appellant] was coincidentally at the front of the complainant's house, going through his trash, drawing

attention to himself and the house, sometime before Mr. Livingston was at the back of the house pointing a gun at the complainant.

**Id.**

Initially, we note our standard of review:

The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [finder] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

**Commonwealth v. Best**, 120 A.3d 329, 341 (Pa.Super. 2015) (quotations and citations omitted).

Appellant challenges the sufficiency of the evidence as to his conviction for conspiracy.

To sustain a conviction for criminal conspiracy, the Commonwealth must establish that the defendant (1) entered into an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and (3) an overt act was done in furtherance of the conspiracy. "This overt act need not be committed by the defendant; it need only be committed by a co-conspirator."

- 9 -

As our Court has further explained with respect to the agreement element of conspiracy:

> The essence of a criminal conspiracy is a common understanding, no matter how it came into being, that a particular criminal objective be accomplished. Therefore, a conviction for conspiracy requires proof of the existence of a shared criminal intent. . . .Even if the conspirator did not act as a principal in committing the underlying crime, he is still criminally liable for the actions of his co-conspirators in furtherance of the conspiracy.

*Commonwealth v. McCall*, 911 A.2d 992, 996-97 (Pa.Super. 2006) (quotations and citation omitted). *See* 18 Pa.C.S.A. § 903(a)(1) (defining conspiracy).

In rejecting Appellant's claim, and finding the evidence was sufficient, the trial court relevantly indicated the following:

> Because direct evidence of the defendant's intent or the conspiratorial agreement is seldom available in a prosecution for conspiracy, conspiracy can be established entirely through circumstantial evidence.
>
> ***
>
> In the present case, [Appellant] knocked on the front door of the house under the guise of alerting the occupants to a power outage. One or both of the [d]efendants had manually turned off the power, which only affected Ms. Burnside's residence. While [Appellant's] actions were targeted to the front of the house, his co-conspirator approached the back door of the house, through the gate, [and] armed with a gun[,] which he used to hold Mr. Scott hostage. [Mr.] Livingston was positively identified by Ms. Burnside as the man she witnessed with the gun[.] [Appellant] was positively identified as the man knocking on their door in the middle of the night about a power outage. The specificity of the feigned power outage, the late hour, the knock at the front door and windows, the intrusion into the backyard, and the flight from police, all allowed the [trial court judge] to reasonably infer that

- 10 -

[Appellant] and Mr. Livingston conspired together in committing these crimes.

Trial Court Opinion, filed 10/11/17, at 9-10 (citations omitted).

We agree with the trial court's analysis. We specifically disagree with Appellant's claim the evidence reveals, at most, that he was "merely present" at the scene of the crime. We note that, in developing his argument, Appellant views the evidence in the light most favorable to him. However, applying the appropriate standard of review, the evidence supports the trial court's conclusion that Appellant was not "merely present;" but rather, he was an active participant who assisted Mr. Livingston in committing a rouse to lure the victims out of their home. *See Best*, *supra*. Thus, we reject Appellant's sufficiency of the evidence claim.

In his second claim, Appellant contends the evidence was insufficient to sustain any of his convictions related to the possession of the cocaine or the firearm. In this vein, Appellant contends there was insufficient evidence to demonstrate that he actually or constructively possessed the baggie of cocaine or firearm, which was seized from the gap in the fence in the backyard of 20 South 45th Street.

As Appellant notes, the crimes of PWID, possession of a controlled substance, and possession of an instrument of crime, as well as the crimes for which Appellant was convicted under the VUFA,[3] "all have one thing in

---

[3] Appellant was convicted of violating 18 Pa.C.S.A. §§ 6105, 6106, and 6108.

common: In order to sustain a conviction, the Commonwealth must prove that the accused actually or constructively possessed the contraband." Appellant's Brief at 16 (citing 35 P.S. §§ 780-113(a)(30) and (a)(16); 18 Pa.C.S.A. §§ 6105, 6106, 6108, and 907) (other citations omitted).

Here, there is no evidence that Appellant was observed in actual possession of either the baggie of cocaine or firearm. Thus, the Commonwealth was required to establish that he had constructive possession of the seized items to support his convictions. *See Commonwealth v. Brown*, 48 A.3d 426, 430 (Pa.Super. 2012).

> Constructive possession is a legal fiction, a pragmatic construct to deal with the realities of criminal law enforcement. Constructive possession is an inference arising from a set of facts that possession of the contraband was more likely than not. We have defined constructive possession as conscious dominion. We subsequently defined conscious dominion as the power to control the contraband and the intent to exercise that control. To aid application, we have held that constructive possession may be established by the totality of the circumstances.

*Id.* (quotation marks and quotation omitted).

Here, in rejecting Appellant's claim the evidence was insufficient to demonstrate that he had constructive possession of the baggie of cocaine and firearm, the trial court relevantly indicated the following:

> In the instant case, the Commonwealth's evidence established, beyond a reasonable doubt, that [Appellant] had constructive possession of the crack cocaine and gun. The contraband was discovered right next to where [Appellant] was hiding in the [] courtyard. Though it was a semi-public area for the residents of the complex, . . .there were no other people around the stashed contraband. Additionally, an officer had observed [Appellant] presumably texting on his cell phone, and

- 12 -

the drugs, gun, and cell phone were all found [in the same area]. When discovered by police officers in his hiding place, [Appellant] jumped, shouted "Fuck that. You're just going to have to shoot me," then hopped the fence into the next yard and proceeded to break into another house in an attempt to evade the police capture. Finally, [Appellant's] co-conspirator was found with $3,000 on his person. In summary, the evidence and reasonable inferences drawn therefrom indicate that [Appellant] knew of the existence of the crack cocaine and gun, and concealed it or was aware of its concealment in a place to which he would have future access. The ability to exercise domain or control and the intent to do so are thus present, establishing constructive or joint constructive possession.

Trial Court Opinion, filed 10/11/17, at 12-13.

We agree with the trial court's analysis. Applying our standard of review, and examining the totality of the circumstances, we agree with the trial court that the evidence was sufficient to establish Appellant constructively possessed the baggie of crack cocaine and firearm.[4] *See Commonwealth v. Hutchinson*, 947 A.2d 800 (Pa.Super. 2008) (holding evidence sufficient to demonstrate constructive possession of cocaine found in rafters of a park

_____

[4] We note that Appellant repeatedly asserts on appeal that he was "excluded as a source of the DNA found on the gun." Appellant's Brief at 16, 18. Appellant has mischaracterized the parties' stipulation as to the DNA evidence. The parties stipulated that partial DNA was found on the outside of the firearm (*i.e.*, the handle, magazine release, and trigger area of the firearm); however, due to insufficient data, the samples relative to Appellant and Mr. Livingston were inconclusive. N.T., 10/17/16, at 70-72. While Appellant and Mr. Livingston were excluded as contributors of the DNA found inside the firearm on the empty magazine, *id.* at 72, such evidence is not dispositive and does not render the evidence of constructive possession against Appellant insufficient. Rather, based on the totality of the circumstances and applying the appropriate standard of review, such evidence tends to suggest, at most, that someone other than Appellant or Mr. Livingston loaded the gun at some point prior to the incident. *See Brown*, *supra*.

- 13 -

pavilion where police observed the defendant in the park after closing hours, the defendant reached into the rafters, and the defendant sat on a park bench counting money).

For all of the foregoing reasons, we reject Appellant's sufficiency of the evidence claims, and we affirm his judgment of sentence.

Affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/10/18